UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


TERRY RICHARDSON                    :
                                    :                    PRISONER
        v.                          :         Case No. 3:03cv1621(AWT)
                                    :
EDWARD BLANCHETTE, et al.[1]        :


RULING ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND OTHER PENDING MOTIONS

        Plaintiff Terry Richardson ("Richardson"), who is currently incarcerated at the MacDougall-Walker Correctional Institution in Suffield, Connecticut, brings this civil rights action pro se pursuant to 28 U.S.C. § 1915.  Richardson challenges his medical care for Hepatitis C pursuant to 42 U.S.C. § 1983, as set forth in his amended complaint.  He alleges that the defendants' denial of treatment for Hepatitis C constitutes deliberate indifference to a serious medical need in violation of the Eighth Amendment to the United States Constitution and that it

_____

        [1]The named defendants are Dr. Edward Blanchette, Dr. John Gittzus, Dr. Frederick Altice and Dr. Mark Buchanan.  In the body of the amended complaint, plaintiff states that he has included the Connecticut Department of Correction as a defendant for his ADA claim only. The University of Connecticut was included in the caption of the original complaint but omitted from the caption of the amended complaint.  Because the Department of Correction and University of Connecticut were not included in the caption of the amended complaint, they have been terminated as defendants.

constitutes negligence.  The plaintiff also alleges that the
defendants denied him medical treatment for Hepatitis C in
violation of the Americans with Disabilities Act and the
Rehabilitation Act of 1973.  The defendants have filed a motion
for summary judgment.  For the reasons that follow, the
defendants' motion for summary judgment is being granted.

I.  <u>Factual Background</u>[2]

Defendant Dr. Buchanan, a licenced physician, has served as
the Clinical Director of the Correctional Managed Health Care
Program ("CMHC") at the University of Connecticut Health Center.
This program provides health care to Connecticut inmates.  CMHC
has issued a comprehensive Hepatitis C Management and Treatment
Policy which includes a Hepatitis C Review Board ("Hep CURB") to
review inmate requests for treatment of the Hepatitis C virus
("HCV").  Defendants Drs. Blanchette, Gittzus and Altice, all
licensed physicians certified in infectious diseases, are the
three members of the Hep CURB.  They have served on the Hep CURB
since its creation in December 2002.  All three defendants do not

---

[2]The facts are taken from defendants' Local Rule 56(a)1
Statement [doc. #38-2]; the affidavits of Edward Blanchette, M.D.
[doc. #38-5] with attached exhibits, John Gittzus, M.D. [doc.
#38-7], Frederick Altice, M.D. [doc. #38-3] and Mark Buchanan,
M.D. [doc. #38-4], which were filed in support of the defendants'
motion for summary judgment; Richardson's Statement of Disputed
Factual Issues [doc. #62-2] with attached exhibits, and
Richardson's Declaration in Opposition to Defendants' Motion for
Summary Judgment [doc. #62-5].

personally examine every inmate.  Instead, they review the
records of the inmate, including the reports of the infectious
disease specialist treating that inmate.

On June 15, 1999, Richardson was transferred to MacDougall-
Walker Correctional Institution.  Defendant Blanchette began
treating Richardson in the infectious disease clinic at that
time.  Defendant Blanchette has conferred with Richardson
regarding a rare lung infection, diabetes and HCV.

The initial testing that revealed the presence of HCV was
done on July 29, 1998.  The results were confirmed by tests done
on October 8, 1999, and June 30, 2000.  Test results showed
pretty good hepatic function and quite stable liver enzyme
levels.  Those levels were moderately elevated during the period
from October 2001 through April 2002.  Richardson has refused to
undergo various tests, including tests to evaluate hepatic
function, ordered by his treating physician in August 2004.

Defendant Blanchette's initial concern was Richardson's lung
infection.  Blanchette discussed with Richardson the possibility
of discontinuing treatment because the symptoms appeared to have
resolved and the medication was causing elevated liver enzyme
levels.  Blanchette reduced the medication dosage in July 1999.
Richardson decided to terminate treatment for the lung infection
in September 1999 after discussing the risks and benefits of

3

continuing treatment with defendant Blanchette.

In October 1998, CMHC established guidelines for HCV treatment.  The guidelines adopted criteria established by the National Institute of Health ("NIH") for HCV therapy.  The CMHC guidelines require periodic liver function studies to establish transaminase (ALT) values.  If ALT values remained above 100 for a period of four to six months, the inmate would be referred to the CMHC Utilization Review Committee for approval of further evaluations and tests.  These tests would determine if the inmate was a candidate for HCV drug therapy.  In July 2000, the guidelines were modified to require referral of inmates whose ALT levels exceeded 80 for four to six months.

In January 2000, defendant Blanchette informed Richardson that his ALT levels were consistently below 100 and, thus, that he did not qualify for further HCV treatment.  Blanchette discussed HCV therapy with Richardson in the event that his condition worsened and he became a candidate for treatment.  In February 2000, Blanchette noted that Richardson's hepatic function was stable and he still was not a candidate for HCV therapy.  In April 2000, Richardson's ALT levels had shown only minor increases.  All remaining liver function tests were normal.  Again, in August 2000, Blanchette noted that Richardson was not a

4

candidate for HCV therapy because his ALT levels were not persistently above 80.

In May 2001, Richardson informed defendant Blanchette that he soon would be considered for parole and asked Blanchette to submit his medical history to the parole board.  HCV therapy takes approximately one year.  In light of the possibility of parole, any consideration of HCV therapy for Richardson was deferred until the parole board had made its decision.  The parole board must have denied parole because Richardson remains incarcerated.

In October 2001, Richardson's ALT levels began to exceed 80.[3]  Defendant Blanchette noted, however, that Richardson was not a candidate for HCV therapy because his diabetes was poorly controlled.  In Blanchette's opinion, the risks associated with uncontrolled diabetes exceeded the risk from HCV.  HCV guidelines from the Federal Bureau of Prisons indicate that poorly controlled diabetes is a contraindication to HCV therapy.

_____

[3]Richardson's medical records reveal the following ALT levels:  June 30, 1999, 97; July 21, 1999, 64; August 11, 1999, 69; August 18, 1999, 61; September 1, 1999, 58; September 10, 1999, 63; October 8, 1999, 87; December 10, 1999, 73; January 7, 2000, 73; February 9, 2000, 53; March 8, 2000, 82; April 5, 2000, 62; October 4, 2000, 76; November 3, 2000, 79; December 4, 2000, 53; January 17, 2001, 72; February 1, 2001, 77; March 21, 2001, 61; October 10, 2001, 95; November 21, 2001, 122; February 6, 2002, 95; March 11, 2002, 83; April 1, 2002, 99; August 2, 2002, 80; August 9, 2002, 82; September 18, 2002, 72; March 22, 2004, 53.

Richardson is not compliant with his doctors' efforts to control his diabetes.  He insists he knows best how to manage his diabetes despite repeated warnings from Blanchette and Richardson's treating physician.

There are two ways to test glucose levels.  The finger stick method measures the glucose level at a particular point in time. A test of Glycohemoglobin reflects glucose levels over time because Glycohemoglobin levels increase as glucose levels remain high for an extended period of time.  The normal range for Glycohemoglobin is 4.4% - 6.4%.  Defendant Blanchette would like Richardson to get his readings to 7.0% or less.  Periodic testing reveals that Richardson's levels consistently are 8.0% or above.[4]

On March 24, 2004, the Hep CURB revisited Richardson's request for a liver biopsy.  The guidelines require the board to assess contraindications to HCV therapy before ordering a liver

---

[4]Richardson's medical records reveal the following Glycohemoglobin levels:  January 19, 2000, 7.2%; March 8, 2000, 8.9%; May 5, 2000, 9.0%; June 30, 2000, 8.5%; November 30, 2000, 7.5%; December 4, 2000, 8.1%; March 26, 2001, 10.5%; June 8, 2001, 9.0%; August 27, 2001, 8.5%; October 1, 2001, 7.9%; November 21, 2001, 8.5%; December 12, 2001, 8.1%; February 6, 2002, 7.8%; February 27, 2002, 8.1%; March 11, 2002, 8.2%; April 1, 2002, 8.1%; June 3, 2002, 9.4%; June 17, 2002, 8.7%; August 9, 2002, 8.2%; August 26, 2002, 8.3%; September 9, 2002, 7.9%; September 18, 2002, 8.3%; October 16, 2002, 7.7%; November 6, 2002, 8.1%; December 13, 2002, 8.2%; January 9, 2003, 8.5%; March 27, 2003, 8.7%; May 22, 2003, 8.3%; July 10, 2003, 8.6%; October 23, 2003, 9.0%; December 29, 2003, 9.9%; February 23, 2004, 10.1%; April 23, 2004, 8.8%.

biopsy.  The Hep CURB determined that in light of the
contraindication, i.e., Richardson's poorly controlled diabetes,
it would be medically inappropriate to conduct a liver biopsy at
that time.

Defendant Blanchette has offered to admit Richardson to the
inpatient medical unit so medical staff can carefully monitor his
food intake and insulin doses and assist Richardson in
controlling his diabetes.  Richardson has declined the offer.

II.  <u>Standard of Review</u>

A motion for summary judgment may not be granted unless the
court determines that there is no genuine issue of material fact
to be tried and that the facts as to which there is no such issue
warrant judgment for the moving party as a matter of law.  Fed.
R. Civ. P. 56(c).  <u>See</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317,
322-23 (1986); <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d
1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of
summary judgment . . . against a party who fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and on which that party will bear
the burden of proof at trial."  <u>See</u> <u>Celotex Corp.</u>, 477 U.S. at
322.

When ruling on a motion for summary judgment, the court must
respect the province of the jury.  The court, therefore, may not

try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire
Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce &
Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is
well-established that "[c]redibility determinations, the weighing
of the evidence, and the drawing of legitimate inferences from
the facts are jury functions, not those of the judge."  Anderson,
477 U.S. at 255.  Thus, the trial court's task is "carefully
limited to discerning whether there are any genuine issues of
material fact to be tried, not to deciding them.  Its duty, in
short, is confined . . . to issue-finding; it does not extend to
issue-resolution."  Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be
resolved is both genuine and related to a material fact.
Therefore, the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment.  An issue is "genuine
. . . if the evidence is such that a reasonable jury could return
a verdict for the nonmoving party."  Anderson, 477 U.S. at 248
(internal quotation marks omitted).  A material fact is one that
would "affect the outcome of the suit under the governing law."
Id.  As the Court observed in Anderson: "[T]he materiality
determination rests on the substantive law, [and] it is the

substantive law's identification of which facts are critical and which facts are irrelevant that governs."  Id.  Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment.  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil,

Inc., 922 F.2d 118, 121 (2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant.  Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact."  Weinstock, 224 F.3d at 41.  If the nonmovant fails to meet this burden, summary judgment should be granted.  The question then becomes:  is there sufficient evidence to reasonably expect that a jury could return a verdict

in favor of the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

III. Discussion

Richardson states, in his amended complaint, that he brings this action to assert claims for violation of his civil rights and for violations of the Americans with Disabilities Act and the Rehabilitation Act.  However, in his opposition to the defendants' motion for summary judgment, Richardson asks the court to dismiss the claims for violation of the Americans with Disabilities Act and the Rehabilitation Act.  (See Pl.'s Mem., Doc. #62, at § D.)  Richardson's request that these claims be dismissed is being granted.

In his opposition to the defendants' motion for summary judgment, Richardson asserts that the defendants are deliberately indifferent to his serious medical needs because they are delaying HCV treatment.  He also asserts that his right to receive proper medical care was violated because he was not immediately informed that he tested positive for HCV.  The defendants move for summary judgment on five grounds: (1) any claim for damages against the defendants in their official capacities is barred by the Eleventh Amendment, (2) the defendants did not violate any of Richardson's constitutional rights, (3) Richardson fails to state a claim under the Americans

11

with Disabilities Act or the Rehabilitation Act, (4) any negligence claims are barred by the statutory immunity afforded state employees, and (5) all the defendants are shielded from liability by the doctrine of qualified immunity.  Richardson has responded to the motion for summary judgment and has moved to strike all or portions of the affidavits filed by the defendants.

A.   <u>Motion to Strike Affidavits</u>

As a preliminary matter, the court considers Richardson's motion to strike some or all of the affidavits submitted by the defendants.  He contends that the affidavits are not made on personal knowledge and that copies of all referenced documents are not attached.

Richardson moves to strike defendant Buchanan's affidavit in its entirety because defendant Buchanan states that he has never met Richardson and has no personal familiarity with Richardson's medical issues.  As the clinical director of CMHC, defendant Buchanan is responsible for the management of inmate health care. In his affidavit, defendant Buchanan describes the CMHC Hepatitis C Management and Treatment Policy and his responsibility to ensure that the Hep CURB functions properly.  These matters are within his personal knowledge.  Thus, Richardson's motion to strike is being denied as to defendant Buchanan's affidavit.

Richardson moves to strike paragraph 8 of the affidavits of defendants Gittzus and Altice for seeking to adopt and incorporate paragraphs 21 through 29 of defendant Blanchette's affidavit.  Defendants Gittzus and Altice each state in paragraph 8 that, in his opinion, it would be medically inappropriate for Richardson to begin HCV therapy until he demonstrates improvement in the control of his diabetes.  Each then states that the reasons for his opinion are as set forth in defendant Blanchette's affidavit.  As members of the Hep CURB, defendants Blanchette, Gittzus and Altice review the medical records of HCV inmates to determine whether to authorize testing, such as a liver biopsy, and drug therapy.  All three defendants do not personally examine every inmate.  Instead, they review the records of the inmate, including the reports of the infectious disease specialist treating that inmate.  Defendant Blanchette is the infectious disease specialist who has been treating Richardson since 1999.  Thus, defendants Gittzus and Altice would necessarily review defendant Blanchette's records and decide whether they concurred with his conclusion.  In paragraph 8 of each affidavit, the doctor explains what information supports his medical opinion.  Thus, Richardson's motion to strike is being denied as to the affidavits of defendants Gittzus and Altice.

13

Finally, Richardson moves to strike defendant Blanchette's affidavit because he disagrees with some of the statements and because he claims that defendant Blanchette has not included all of the referenced documents.

Richardson disagrees with defendant Blanchette's statement that Richardson's liver enzyme levels have been stable.  He contends that the levels have been elevated.  Richardson appears to equate the term "stable" with "within normal limits." Defendant Blanchette never stated that Richardson's liver enzyme levels were normal.  Thus, Richardson's argument is without merit.  In addition, Richardson disagrees with defendant Blanchette's medical opinion regarding preferred blood sugar levels.  Richardson is not a physician and, in any event, his disagreement with the medical opinion is not a reason to strike defendant Blanchette's affidavit.

Richardson also faults defendant Blanchette's affidavit because, claims Richardson, Blanchette attaches only the CMHC HCV treatment policy and not all other guidelines upon which the CMHC policy was based.  The CMHC treatment policy is not at issue in this case.  Thus, there is no reason why defendant Blanchette should be required to supply all supporting treatment guidelines. The court notes that defendant Blanchette also attached to his affidavit the Federal Bureau of Prisons HCV treatment guidelines.

14

Finally, Richardson disputes the accuracy of statements in the CMHC treatment policy referencing specific ALT values.  He contends that the included excerpts from other treatment guidelines do not reference these numbers as defendant Blanchette states.  First, defendant Blanchette has attached the Federal Bureau of Prisons HCV treatment guidelines which reflect the same ALT levels as the CMHC guidelines.  Second, Richardson provides no evidence showing how the National Institute of Health defines elevated liver enzyme levels.  Third, the fact that Richardson disagrees with the information in the exhibits is not a reason to strike the affidavit.  The court can discern what information has been interpreted by CMHC, and Richardson was free to dispute the level in his opposition to the motion for summary judgment.  Accordingly, Richardson's motion to strike is also being denied as to defendant Blanchette's affidavit.

B.    <u>Eleventh Amendment Immunity</u>

The defendants argue that any claims for damages against them in their official capacities are barred by the Eleventh Amendment.  However, in his amended complaint, Richardson states that he seeks damages from the defendants in their individual capacities only.  Because Richardson does not seek damages from the defendants in their official capacities, their argument in favor of summary judgment on this ground is moot.

C.   Delay in Providing HCV Treatment

Richardson contends that defendants are deliberately indifferent to his serious medical need because they will not approve him for HCV drug therapy until his diabetes is better controlled.[5]

Deliberate indifference by prison officials to a prisoner's serious medical need constitutes cruel and unusual punishment in violation of the Eighth Amendment.  See Estelle v. Gamble, 429 U.S. 97, 104 (1976).  To prevail on such a claim, Richardson must allege "acts or omissions sufficiently harmful to evidence deliberate indifference" to his serious medical need.  Id. at 106.  He must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  See id. at 104-05.

---

[5]Although not alleged in the amended complaint, the plaintiff, in his opposition to the defendants' motion for summary judgment (Doc. No. 62), suggests that the defendants delayed or failed to treat him because of the associated costs. The Second Circuit has held that prison officials may be deliberately indifferent to a serious medical need when they withhold necessary treatment because of the associated costs. See Chance v. Armstrong, 143 F.3d 698, 704 (2d Cir. 1998). However, the plaintiff fails to provide any evidence or information to support his claim.  The record contains no evidence suggesting that the plaintiff required interferon and reflects that the defendants refused to prescribe interferon based upon the plaintiff's test results and not solely based upon cost.  Accord Cardinales v. Bianchi, No. 3:98CV00515 (DJS)(TPS), slip op. at 12-13 (D. Conn. Mar. 26, 2001).  Therefore, this claim, to the extent it is made, is also being dismissed.

Mere negligence will not support a section 1983 claim; "the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation," id.; rather, the conduct complained of must "shock the conscience" or constitute a "barbarous act." McCloud v. Delaney, 677 F. Supp. 230, 232 (S.D.N.Y. 1988) (citing United States ex rel. Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970)); see also Estelle, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Tomarkin v. Ward, 534 F. Supp. 1224, 1230 (S.D.N.Y. 1982) (holding that treating physician is liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind").

Inmates do not have a constitutional right to the treatment of their choice. See Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986). Thus, mere disagreement with prison officials about what constitutes appropriate care can not serve as the basis for a claim cognizable under the Eighth Amendment. See Ross v. Kelly, 784 F. Supp. 35, 44 (W.D.N.Y. 1992), aff'd, 970 F.2d 896 (2d Cir. 1992).

There are both subjective and objective components to the deliberate indifference standard.  See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994).  The alleged deprivation must be "sufficiently serious" in objective terms.  See id.  The Second Circuit has identified several factors that are relevant to the inquiry into the seriousness of a medical condition:  "'[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'"  Chance v. Armstrong, 143 F.3d 698, 702 (2d. Cir. 1998) (citation omitted).  In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious.  See Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000).

In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, Richardson also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind."  Hathaway, 37 F.3d at 66.  "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware

of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).

The judgment of prison doctors is presumed valid unless the prisoner provides evidence that the decision was "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." White v. Napoleon, 897 F.2d 103, 113 (3d Cir. 1990).  In White, the prison doctor deliberately refused to tell White, who was severely allergic to penicillin, whether the medication he had prescribed contained penicillin.  The court found that there was no ready justification for this decision and concluded that the doctor's refusal was "so far outside the realm of professional judgment as to demonstrate the [doctor] was not exercising professional judgment at all."  Id. at 114.  In addition, the doctor repeated a previously failed treatment.  The court noted that if the sole purpose for repeating the treatment was to cause pain, the treatment would state a claim under the Eighth Amendment.  If, however, the doctor thought the treatment would be beneficial and, later, was shown to be incorrect, the doctor's

19

actions would constitute only medical malpractice.  See id. at
110-11.

Richardson suffers from HCV.  For purposes of this motion,
the court concludes that chronic Hepatitis C is a serious medical
condition.  See Christy v. Robinson, 216 F. Supp. 2d 398, 413
(D.N.J. 2002).  However, the analysis as to the existence of a
serious medical need is fact-specific and "must be tailored to
the specific circumstances of each case."  Smith, 316 F.3d at
185.  See Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004)
(agreeing with district court's determination that although
Hepatitis C infection was a serious medical need, the issue was
whether inmate had serious medical need for immediate interferon
treatment).  The pertinent issue in this case, therefore, is not
whether Richardson suffers from HCV, but rather, whether he
should be provided any treatment for HCV prior to such time, if
any, when his diabetes is better controlled.

Richardson argues that his diabetes is well-controlled and
that the defendants are attempting to manipulate his blood sugar
levels to excuse their failure to provide HCV treatment.  He has
not, however, provided any evidentiary support for this
assertion.

The Glycohemoglobin test results show that during the period
from January 2000 through April 2004, Richardson's levels

20

constantly fluctuated, ranging between 7.2% to 10.5%.  Defendant
Blanchette's treatment notes reveal a continued concern over
Richardson's diabetes and the possibility that Richardson was
manipulating his glucose levels to support his personal view of
appropriate treatment.  On July 26, 1999, after reviewing
Richardson's chart, defendant Blanchette noted:

> There were [] issues raised regarding his
> regular insulin coverage in the AM–pt insists
> that he need[s] a background dose of regular
> insulin regardless of the value of his AM
> FSG.  His diabetic control was quite good in
> the first half of July, but more recent
> values were more widely spread with
> occasional values that were quite high.  This
> corresponds to a pattern I have seen with
> this patient previously.  He tends to be
> quite manipulative with regards to his DM
> [diabetes mellitus] regimen, and I am not
> surprised that his insistence that he
> required more regular insulin in the AM would
> translate itself suddenly into high glucose
> levels in the AM to support his demand
> (?actually related to dietary indiscretion).
> A similar situation occurred when he was
> petitioning for a higher calorie diet
> (glucose values suddenly dropped to very low
> levels–?related to deliberately undereating
> with usual insulin dose).
>
> His diabetic control overall has actually
> been quite adequate on the basis of a Hb A1c
> [Glycohemoglobin] value of 7.3% earlier this
> month.  Nevertheless, I will change the
> regular insulin sliding scale to correspond
> with the patient's wishes, since I believe he
> will be determined to "prove his point"
> unless he receives the regimen he desires.

(Blanchette Aff., doc. #38-5, Ex. E at 3.)

In August 2000, defendant Blanchette noted that Richardson's diabetes was under moderately good control, with Glycohemoglobin levels in the previous months ranging from 9.0% to 7.2%.  After this visit, Richardson was "less than compliant with his diabetes mellitus regimen."  (Id. Ex. E at 10.)  Richardson wanted to lose weight and decided to do so by refusing his morning insulin injection for a month in February and March 2001.  As a result he suffered significant hyperglycemia and his diabetes was out-of-control.

In January 2002, defendant Blanchette noted that Richardson's glucose levels had been "extremely erratic."  (Id. Ex. E at 11.)  Richardson admitted to considerable fluctuation in caloric intake and to taking more candy than he should to relieve hypoglycemic episodes at night.  Richardson refused defendant Blanchette's suggestion to increase his insulin dosage, instead requesting that it be decreased.  Defendant Blanchette told Richardson that a decrease would not be prudent.  In May 2002, defendant Blanchette noted: "Pt's request for Hep C treatment noted.  The major problem with considering Hep C Rx in this pt → his poor diabetic control.  The pt has insisted upon having his own way re insulin dosing schedules + what I believe is major fluctuation in his caloric intake day-to-day."  (Id. Ex. J at 6.) Despite these concerns, defendant Blanchette agreed to refer

Richardson's case to the Hep CURB.  In June 2002, Richardson's primary care doctor reported: "[Glycohemoglobin] confirms very poor glucose control.  Patient has to want to control his DM before it can be done.  He has clearly talked his way out of Insulin doses . . . ."  (Id.)

By August 2002, defendant Blanchette noted some improvement, but reported that Richardson's primary care physician noted continued unsatisfactory Glycohemoglobin levels.  Defendant Blanchette again noted that Richardson was interested in HCV therapy.  Although he ordered baseline tests, defendant Blanchette stated that Richardson might not be a candidate for HCV therapy if his diabetes was not adequately controlled.

Richardson's medical records reveal continued disregard for doctors' orders and attempts to self-treat his diabetes.  On September 20, 2001, the primary care doctor noted Richardson's refusal of insulin and resulting high Glycohemoglobin levels. The doctor noted that he would not stop medically necessary medication.  Through November 2001, Richardson repeatedly refused his insulin and suffered near syncope episodes.

In October 2002, Richardson admitted to his doctor that his dietary indiscretions caused swings in his glucose levels and prevented better control.  In December 2002, the primary care doctor noted that Richardson's Glycohemoglobin levels were

trending higher.  He reported that Richardson had not taken his dietary advice and that Richardson's preferred treatment plan did not reduce blood glucose levels.

In April 2003, the primary care doctor noted: "[Ongoing] pattern of being in range of 8.2 +/- .5.  Patient is always giving explanations for not complying but the result is always the same[--]mediocre to poor glucose control.  When patient wishes to take this disease serious and control it the medical staff will help him."  (Id. Ex. J at 12.)  In October 2003, the primary care doctor noted that Richardson "refuses to hear" any advice that contradicted his own medication plan and that, regardless of what insulin levels were prescribed, Richardson would eat as required to increase his blood sugar level to a range where he felt good, regardless of the medical advisability of that level.  (Id. Ex. J at 15.)

The evidence demonstrates a continued effort by medical staff to control Richardson's diabetes.  On the other hand, Richardson has provided no evidence to support his conclusory statements that the defendants are manipulating his insulin to ensure that his glucose levels remain high.

In addition, the defendants have provided evidence that Richardson did not meet the criteria for HCV treatment.  For most of the relevant period, Richardson's ALT levels were not

24

consistently high.  During the time that Richardson's ALT levels were high, his diabetes was not controlled.  Uncontrolled diabetes is a contraindication for HCV therapy.  Thus, Richardson did not meet the requirements for HCV therapy.

The defendants have provided a copy of the February 2003 guidelines for HCV treatment followed by the Federal Bureau of Prisons.  (See Blanchette Aff., doc. #38-5, Ex. L.)  The guidelines define minimally elevated ALT levels as less than two times the upper limit of normal and note that persons with minimally elevated ALT levels should be monitored but are at low risk of rapid disease progression.  The upper limit of normal is 39.  Thus, any inmate with ALT levels below 78 would not routinely be recommended for treatment.  The guidelines recommend that an inmate with persistent ALT levels at more than two times the upper limit of normal should be considered for treatment unless contraindications are present.  Poorly controlled diabetes is a relative contraindication to HCV treatment.

Richardson has provided a copy of the February 2002 CMHC guidelines for HCV treatment, which includes a treatment algorithm from the Federal Bureau of Prisons.  The algorithm recommends treatment for an inmate with no contraindications whose ALT levels are between 1.5 and 2 times the upper limit of normal three times during a twelve month period.

The only time Richardson's ALT levels consistently exceeded two times the upper limit of normal was the period from October 2001 through August 2002.  The February 2002 treatment algorithm defined out of control diabetes as a Glycohemoglobin level in excess of 8.5%.  During this time, Richardson's glucose levels were out of control and he was disregarding doctor's orders in favor of his own treatment plan.  Richardson's Glycohemoglobin level was at 8.5% in November 2001, and 8.7% and 9.4% in June 2002.  Richardson has provided no evidence that could show that the defendants' decision not to offer him HCV treatment during this period was not based on sound medical judgment.  Although Richardson alleges in his amended complaint that "Phyllis Beck of HCV foundation" told him that "there is no reason for diabetics to be EXCLUDED from therapy" and "[t]hat a liver biopsy should have been performed, and they are not being truthful with the plaintiff," he has provided no affidavit or other admissible evidence from Beck.  Nor does he indicate exactly what information was provided to Beck to elicit this statement.  (Am. Compl. at 9.)

The court concludes that Richardson has failed to meet his burden of producing evidence that could show that the defendants were not relying on their medical judgment in determining that Richardson was not a candidate for HCV treatment while his

26

diabetes remained poorly controlled.  Compare Cardinales v.
Bianchi, No. 3:98cv515(DJS)(TPS), slip op. at 11-13 (D. Conn.
Mar. 26, 2001) (holding that denial of HCV therapy where inmate
did not meet NIH guidelines was not deliberate indifference).
Thus, Richardson's claim constitutes only a disagreement about
appropriate treatment, which is not cognizable under section
1983, and the defendants' motion for summary judgment on this
ground should be granted.

     D.   Failure to Promptly Communicate HCV Diagnosis

     Richardson alleges that he tested positive for HCV sometime
between 1995 and 1999, but was not informed of this diagnosis
until he met with defendant Blanchette on June 16, 1999, the day
after Richardson was transferred to MacDougall-Walker
Correctional Institution.

     The limitations period for filing a section 1983 action is
three years.  See Lounsbury v. Jeffries, 25 F.3d 131, 134 (2d
Cir. 1994) (holding that, in Connecticut, the general three-year
personal injury statute of limitations set forth in Connecticut
General Statutes § 52-577 is the appropriate limitations period
for civil rights actions asserted under 42 U.S.C. § 1983).

     The initial test that showed Richardson was HCV positive was
ordered on July 29, 1998, while Richardson was confined at
Cheshire Correctional Institution.  Because Richardson learned of

the diagnosis on June 16, 1999, this claim is based on the failure, between July 28, 1998 and June 16, 1999, to inform Richardson that he had tested positive for HCV.  Thus, Richardson had until June 16, 2002 to file his complaint.

When considering a case filed by a prisoner, the courts consider a complaint to have been filed as of the date the inmate gives the complaint to prison officials to be mailed to the court.  See Dory v. Ryan, 999 F.2d 679, 682 (2d Cir. 1993) (holding that a pro se prisoner complaint is deemed filed as of the date the prisoner gives the complaint to prison officials to be forwarded to the court) (citing Houston v. Lack, 487 U.S. 266, 270 (1988)).  Richardson signed his original complaint on September 17, 2003, and could not have given it to prison officials for mailing before that date.  Even applying the prison mailbox rule, Richardson filed this claim more than one year too late.

In addition, the record shows that the July 1998 test was ordered by Dr. Anglim, who is not a defendant in this case. Richardson alleges no facts suggesting that any defendant was responsible for his medical care or aware of his condition prior to his transfer to MacDougall-Walker Correctional Institution. Thus, Richardson fails to allege a factual basis for this claim with respect to any defendant in this case.

28

Therefore, this claim is being dismissed for failure to state a claim upon which relief may be granted.  <u>See</u> 28 U.S.C.A. § 1915(e)(2)(B)(ii) (West 1994 & Supp. 2005) (directing the court to dismiss at any time a claim that is frivolous or fails to state a claim upon which relief may be granted).

    E.   <u>State Law Claims</u>

In addition to his federal claims, Richardson asks the court to take supplemental jurisdiction over the state law negligence claims.  Conn. Gen. Stat. § 4-165 states that "[n]o state officer or employee shall be personally liable for damage or injury, not wanton, reckless or malicious, caused in the discharge of his duties or within the scope of his employment."

The plaintiff challenges actions taken by the defendants in the discharge of their duties as either state employees, as in the case of Drs. Blanchette, Gittzus and Buchanan, or pursuant to a contract with the CMHC to provide infectious disease consultation services including serving as a member of the Hep CURB, as in the case of Dr. Altice.  Claims that the defendants were negligent in performing their duties in these respective capacities are barred by section 4-165 of the Connecticut General Statutes.  Accordingly, any state law negligence claims are being dismissed.

IV.  Conclusion

Richardson's motion to strike [**doc. #61**] is hereby **DENIED.**
Richardson's claims for violation of the Americans with
Disabilities Act and Rehabilitation Act are hereby **DISMISSED** at
his request, and Richardson's claim based on the delay in
informing him that he was HCV positive is hereby **DISMISSED**
pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Defendants' Motion
for Summary Judgment [**doc. #38**] is hereby **GRANTED** with respect to
the plaintiff's remaining claims.   Consistent with these
rulings, Richardson's motions for preliminary injunctive relief
[**doc. #51**] and hearing [**doc. #53**] are hereby **DENIED.**

The Clerk is directed to enter judgment in favor of the
defendants and close this case.

It is so ordered.

Dated this 1st day of March 2006, at Hartford, Connecticut.


_____/s/_____
            Alvin W. Thompson
       United States District Judge